Ready for argument in Williams v. Ozmint, Ms. Small. Good morning. May it please the Court, Kirsten Small on behalf of Jerome Williams. Your Honors, it's settled that prison inmates do not lose all of their constitutional rights merely because they've been incarcerated. Ms. Small, I don't mean to hedge you off of the past so soon. Perhaps you could orient us in your presentation on the timing involved in the relief that you're seeking. And my question comes up with the fact that this alleged infraction occurred in March of 2007 and the finding was made by the prison in April of 2007 and we're here in 2013. There was a two-year period of visitation which has expired, has it not?  In the context of your presentation today, if you could tell us what you're asking us to do. What can we do with this case since that time period has expired? Well, Your Honor, the policy is still in existence and Mr. Williams is still subject to its application as is any other inmate in the South Carolina system. Reviewing the record yesterday, barely construed, Mr. Williams' complaint, which was filed pro se at the time, does... This wasn't a declaratory judgment action, was it? Well, I think, construing the pleadings liberally, he does seek, in part, he seeks whatever relief the Court would like to grant. That's the end of his claim. And he also seeks, at the time he filed his complaint, he asked for his rights to be restored, which would be injunctive relief. I think you can read the... Did he have such other and further... He did. He did, Your Honor. He did include that? But what can we really do for him that wouldn't be purely advisory in nature because we'd be talking about future infractions that he may or may not have committed? Well, it would essentially be declaratory relief, Your Honor, and it's really not about infractions he may or may not commit because he didn't commit any infraction in this case. He was not found with contraband. He was not charged with an infraction. Right. He wasn't... This was not a disciplinary violation. So, essentially, he didn't... It didn't go on his record in that sense. So that's why I don't understand what we say in this case, if we agree with you. We say that if this happens again and there is no disciplinary violation, then the prison cannot take away visitation rights? Is that what you're asking us to say? I think that gets to the heart of it, Your Honor. I think what we're seeking here is a declaratory judgment regarding the validity of the policy. But wait a second. Why would we ever say that? You said that he... But he wasn't... This is what concerns me about this case in addition to what Judge Keenan just raised. This would... The state of South Carolina doesn't have a policy that once you become an inmate, you can never have a visitor. They don't have that policy, do they? Not to my knowledge, Your Honor. And this wasn't driven by the fact, although maybe it wasn't proven, they thought he had done something improper. Yes, Your Honor. It was... That was... Right, right, right. They were behind it. They thought that he had done something... Right. So my point is this. Why would we ever say... You ask us for prospective, declaratory, injunctive relief. Why would we ever say to the state of South Carolina that if you think one of your inmates has done something wrong by passing contraband or something with an outsider, you may never limit his visitation? Why would we ever do that? Wouldn't we do just the opposite? And they would have the authority if they thought he did it? And we might decide whether or not there are policies on what proof he had to show and if that was sufficient for them to put that policy in place to punish somebody for what they thought was an effort to pass contraband or something. But why would we ever declare relief to tell a state this, in this form? If you think someone in your prison is trying to pass contraband from an outsider, you may never limit his visitation rights. Who would... Why would we ever do that? Well, I don't think we're... I'm asking you to say that, Your Honor. Well, yes, I thought that's what you just said. In case he did something in the future, you would want us to say they couldn't do it. But that's just the opposite of what we would likely do, isn't it? It doesn't seem to me it makes a very good argument, a policy argument, a legal argument, to come up here and ask us to say, under the facts of this case, that the state should never follow that policy again. Well, Your Honor, let me try to approach it this way. In the case, Lefamine v. County of Anderson, I believe it was, this court, looking back at a previous First Amendment violation, gave declaratory relief. Let me suggest you focus on your due process claim rather than your First Amendment claim. That's fine. I can do that, Your Honor. If you were asked to draft the order in this case, would you use the word never? No, Your Honor, I would not. I think the heart of the problem here is... What word would you use then for prospective relief? What word would you use? In relation to a due process claim, say. I think I'm seeking declaratory relief, Your Honor. I think that's the difference here, less than injunctive relief. I think you can construe it to seek either. I think declaratory is the more appropriate thing. But it would be... Looking at this policy... The state may not, may not, which means never, may not do what? Under what circumstances? That they did in this case. See, interesting questions all, of course, good questions. This is what's concerned me in this case. Sort of the state put it in play by the way they defended this. It strikes me that we are not really faced with a policy where the state says there is no visitation allowed. You're right. That's not their policy. Their policy is no visitation allowed when an inmate does certain things. Well, no, it's not that either. When the warden decides there shall be no visitation. When the warden suspects the inmate has done something but can't prove because there is no contraband. Well, that's right, but that's just the question. I can, in my discretion, deny you visitation for two years. No, no, no, no, but that didn't deviate from my point. The point is, that's right. I'm just making it specific. It's not a blanket policy from the state of South Carolina that says when you become an inmate, you no longer have any right to visitation. That's not at play in this case. That's the way it's been argued. I guess you could get there, but your point is really an argument that I think it's somehow one of these specific facts. This person's visitation was limited improperly under the facts of this case. Under the policy, which we do not have in the record, which makes this case a little bit more difficult because we don't know what the policy actually says. But do you see what I mean? That doesn't go to the right to visitation. That goes to South Carolina not properly applying or having the due process rationale to apply their disciplinary procedure, not in the sense of I'm talking about how they discipline him by removing him. It's a much more limited question, isn't it? I think it's a different question about what rights does the inmate have. The right to visitation in this case, it comes from state policy, doesn't it? Prison policy. They allow visitation. On the due process analysis, yes, that's where it would have to come from. The state created interest in having visitation not taken away unless you have been found guilty of a disciplinary infraction. I think there is an argument to be made that the First Amendment continues to apply. You would do an analysis under Turner v. Safley on the policy that allows the warden to deny visitation without any finding of guilt.  It's noted in the appendix at page 70. There's a signature in a statement saying that it is noted that this is the second time your visitor has been suspended for bringing in contraband. Do you know what that is in reference to? I do not, Your Honor. I have the record just as you do, and that's what it says. It's on page 70 of the appendix. There's no factual development at that point. Perhaps you could take a look at it and tell us on your rebuttal. No, on your rebuttal. Don't take your time now. But that does relate to the point under the Turner analysis, and Judge Davis, I'll turn back to the due process as well, looking at whether there were alternatives to what the warden did here. Right. The easy alternative is to ban his visitor. That would kind of make a difference, wouldn't it? I mean, the Supreme Court in Overton emphasized throughout the opinion that there had been a prior violation of the substance abuse policy. That's true. And was saying this two-year suspension was not unreasonable, given the prior violation. Actually, I guess two in that case. So if, in fact, as page 70 of the appendix indicates, that there was a prior problem regarding this person bringing in contraband, why is there any kind of a problem? Well, not with the banning of Ms. Massey, who is the person who's allegedly brought contraband in twice. The warden banned her visits in particular for two years, and we're not challenging that here. What we're challenging is, in addition to doing that, the warden said, I suspect you of having brought contraband in, so therefore you don't get any visits for two years. No visits at all from anybody. That is the policy we're challenging. Right. But what I'm saying is if, in fact, Mr. Williams has had visitors on two occasions, in their view, create problems, doesn't that add some impetus for them to take this action, cross the borders to visitation? Perhaps it's a factual matter, but I don't know that he's ever been convicted of either of those. We know in this instance he was not charged. There was no contraband found. The record does not reveal, one way or the other, whether in the prior instance it was just that they suspected it, whether they found it. We don't know. This is certainly not a case where we know that there have been two convictions, as in Overton. The policy doesn't say, well, we don't know, but as far as we can tell from the record, this is not a policy like in Overton where it says if you're convicted of this infraction, then this is your punishment. That's why I'm having trouble figuring how can we even contemplate any kind of declaratory relief when we don't even know what the situation is here. Your Honor, that is a problem. I think one option to take is to remand for some factual development. Well, that's what you want, isn't it? I mean, this claim was dismissed on summary judgment, but really it was just a 12B6 motion, wasn't it, when you get right down to it? There had been some discovery, Your Honor. There had been some discovery. I mean, it was appropriate to treat it on summary judgment, but there was not really much in the way of factual development on the visitation issue. It was really focused on the excessive force claim that ultimately went to trial. Was there discovery on the visitation issue? Did he have a lawyer at the time? Not at this point. Not at the point of summary judgment. I mean, the attorney was appointed after summary judgment was granted in part and denied in part. That's correct, Your Honor. So he's never had a lawyer and never had professional discovery on the policy, on this prior conviction or prior sanction against this Miss Massey. I mean, none of that is in the record. We don't know anything about that. That's correct. Okay, but let's say that he shouldn't have had his visitation taken away and that that—let's say there wasn't a factual basis for this Lee's second incident involving Miss Massey. What can this court do by way of an opinion when the relief he's requested is he wants money, he wants his visitation restored—well, it is restored. He wants parole. Well, that's not part of what we can do here either. And any other relief that may seem just and proper because there was negligence, wantonness, carelessness, recklessness. And any other relief would include declaratory relief. What is that relief? I would think it would include declaratory relief, which would establish the existence of a constitutional violation. So we're going to have to write prison policy then, essentially, in the form of declaratory relief. A state prison cannot handle a claim in this way in the future. Isn't that what we'd have to do? Your Honor, I think we have to review this policy and see whether it comports with either due process under that analysis or whether it comports with the Turner analysis if it infringes the constitutional right. We don't write policy. Courts don't write policy, but we do review the policies that are written. And that's what we're asking you to do. How can it possibly be that we would say his constitutional rights were violated? In the constitutional avoidance, why would we ever get there if, in fact, although maybe it's not properly presented, the state didn't deny it. Does anybody suggest there's not an absolute right if there's even a right to visitation? There's not an absolute right to visitation when you're in prison. No, Your Honor, there's not. And so the state then acted on something they thought that he did wrong and denied him what they would otherwise give him, whether it's a constitutional right or not. It's granted by the state in their policies. Apparently, that's clear from the case, right? You can have visitors because he was having them. So why do we even reach the constitutional right issue? I know that may have been thrust upon you because the state jumped right in and argued that from the get-go. It seemed to me we broadened the case, just automatically went to the atomic bomb on this when it might be something much shorter than that. Do you see what I mean? Is it qualified immunity, Your Honor, or are we looking more— No, I'm talking about just on the violation itself, the first step. Why do we—this seems to me the state does not have a policy that would clearly raise the constitutional violation, the first step, if they said no visitation in our prisons at all. The state doesn't say that. No, Your Honor. The state goes there's visitation, but under certain conduct, to whatever proof. There may be some questions. If you commit certain conduct, you lose that privilege of visitation. Right. That's all the state did. I don't see how that really climbs to that great level of constitutional right necessarily. Do you think it has to— The facts here, which you have to take in light most favorable to Mr. Williams because we're looking at the summary judgment against him, are that I didn't commit any conduct, and yet you deny my visitation anyway. The argument is that— No, no, no. Does he deny that they say he did something, though? No. He doesn't deny that they say he did something, but saying he did something doesn't mean it happened. That's a different standard, so then you would have to look at it in the light— you would look at the record, I think, saying if the state— that's what I'm talking about, the standard of proof and how you get there. The state said we thought he did something. We might have been wrong, but we thought he did something, and that is based on our process and thoughts. That's why we took away his privilege. That's the fact, not the fact that he wasn't found guilty of anything, because the question becomes can the state— maybe the due process question would be can the state act on some modicum of proof less than having proved it? If they just suspect, does that allow them, the way they regulate a person, to limit your otherwise open visitation? That seems to me that he's not entitled to say they just picked him— is his suggestion they just picked him at random? He doesn't say that, does he? No, he doesn't, Your Honor, but I do think that we— it's difficult to answer this question in a vacuum. We need to be able to understand what an inmate can normally expect. I would hazard a guess that normally an inmate who complies with the rules, who doesn't commit violations, who's not found to have committed violations, is going to keep his visitation privileges. Mr. Williams says I didn't commit a violation, I wasn't found to have committed a violation, and yet you took away my visitation privileges. That's really the issue here. Thank you very much. Mr. Linderman? May it please the Court, Andrew Linderman here on behalf of the appellees, and I believe we've essentially got an agreement through the briefs that the only appropriate appellee to be remaining in this case would be Warden Willie Eagleton on the visitation issue with all the other issues resolved either at summary judgment or the excessive force issue actually resolved by trial. I want to touch on one point initially, and that is this whole idea that a visitation privilege there was no basis whatsoever for Warden Eagleton to take the action that he did. Well, before we get to that, if we may, Mr. Linderman, do you agree or disagree that visitation is infused with a constitutionally protected liberty interest? I disagree, Your Honor. So you say a warden, for any reason or no reason, so long as it's not invidious, I suppose, I suppose a warden couldn't deny all black inmates visitation, right? Clearly. That's a separate issue. But you say, despite the existence of a policy, and we don't know what that policy is in this case, but let's assume the policy says inmates who behave themselves and comport themselves, et cetera, et cetera, et cetera, lay out the criteria are entitled to visitation amounting to X. You say that wouldn't create a constitutionally protected liberty interest for inmates in the state prison? I do not for two reasons. Number one, I believe that the United States Supreme Court has already addressed that issue in Kentucky Department of Corrections v. Thompson. And second of all, post-Sandon, I believe what you look at is whether or not there's an atypical or significant hardship caused compared to the normal instance of prison life. And you don't have that. Let me see if I follow you. Let me see if I follow you. So a warden could say all blue-eyed inmates shall not have visitation in odd-numbered years. We have this policy that lays out criteria for visitation of various sorts, but a warden could say all blue-eyed inmates in odd-numbered years or months ending with the letter R in them shall not have visitation. You say the warden could do that, even in the face of a general policy that says inmates have this right to visitation. Well, I think there's a precursor question. Are you asking me under the United States Constitution? Yes, I'm asking you whether that policy, whatever it is, and we don't know what it is in this record. And so far as I can tell, the magistrate judge didn't know what it was. So my question is, if I'm following your answer, which you haven't answered my last question yet, but all blue-eyed inmates could be denied visitation in months with the letter R in the name of the month. Well, I think what you have raised there is something that would fall within the Equal Protection Clause and have Equal Protection Clause problems. You mean the class of blue-eyed people versus the class of brown-eyed people is an invidious discrimination? It doesn't need to be invidious discrimination in order for the Equal Protection Clause. It could, you know, obviously, it would require strict scrutiny. No, rational basis would apply. Rational basis would apply. And so where else do we see a requirement of rationality? Well... In the Due Process Clause, right? Under substantive due process, certainly, but... No, I'm talking about procedural due process. No, but in very limited circumstances. And I do believe the Supreme Court has addressed that, and I think Sandy does apply. So in other words, so the blue-eyed inmate would win under the 14th Amendment but lose under the Due Process Clause of the 14th Amendment. Absolutely. Wow, okay. Because... So what about inmates whose shoe size is less than 11? So in odd-numbered years, inmates whose shoe size is less than a size 11, no visitation. But inmates, every other inmate gets a full visitation. No liberty interest protection there. I do not believe so. I believe... So the warden... At best, they would have an Equal Protection Claim. They suppose it had been five years instead of two years. Okay. No judicial review other than within state judicial review process. Based on existing precedent, there would be no constitutional deprivation because White v. Keller... What about eight years? Same facts as this case. Same facts as this case. Warden says eight years, no visitation. Under White v. Keller, this court recognized and adopted the district court opinions as its own, and it's a very well-reasoned opinion, I would submit, that there is no constitutional right to visitation. Now, it's a good... Did this court adopting that district court opinion say that there was no constitutionally protected liberty interest in being free from the arbitrary deprivation of visitation? We didn't go that far, did we? The district court didn't go that far? I would submit that it did, Your Honor. In the district court decision which this court adopted, the White case discussed both a First Amendment approach as well as... We're just talking about due process. As well as due process. And due process on the part of whom? Didn't we in White and the district court in White look separately at the class of inmates and the class of prospective visitors? It did. Okay. So which due process claim did we examine? Well, they looked at both, and what I'm reading... I don't know if that's true. Well, here it says, if I may read from White, and this is at headnote 19, it's not the headnote, but to give the court reference, it's at page 120 of the opinion. It says, as Section 1 makes clear, the visitor plaintiffs have no constitutional right to visit the prisoner plaintiffs. In other words, they have no liberty or property interest as a constitutional matter in visiting the prisoner plaintiffs having no interest or property right in the visitation. Okay, so that's about the visitor. That's talking about the visitor. Now read to us from that opinion that deals with the inmate due process right. Well, that's a point, but I believe... Well, is it a good point or a bad point or an irrelevant point? In the case, I believe it goes on. You're right, I did read from the portion. I have the highlighted portion for the visitors. I believe there's also a portion because they did address not just the rights of the visitors, but they also addressed the rights of the inmates themselves. Under the First Amendment, right? Well, I think they also looked at due process, but I may be wrong about that. Yeah, I think you are. I may be wrong. So you're agreeing that this is not a moot issue, it sounds to me. Excuse me? You've never raised mootness in this case. Well, the only way I've raised mootness, I pointed out in a footnote that regardless of how this court rules on whether or not there is actually a constitutional right to prison visitation and whether this court overrules White v. Keller, that without question Warden Eagleton is entitled to qualified immunity. That right was not clearly established within the Fourth Circuit. In fact, just the opposite. This court held that there was no constitutional right. This court has held that several times in unpublished opinions. You've never said this issue is moot. In a footnote, I did because I'm saying that the only court request for injunctive relief was to overturn the two-year suspension, and the time has passed on that long ago, 2009. There was no request for declaratory relief in this particular case. Such other and further relief, et cetera. That's in there. He got that in there. He does have that in his complaint, but it was never construed by the district court, and I don't believe the objections asked for any type of declaratory relief, so I'm not certain that that issue is even preserved for appellate review. But assuming that it is, I believe that, as I've indicated and as we've briefed, because that was the question that this court asked an appointed counsel to brief, whether or not there is a constitutional right that this court should recognize and whether or not this court should abandon its previous decision in White v. Keller, and I submit that it doesn't. I mean, there's no reason to, and we've gone through each of the different avenues that the plaintiff has presented for arguing that there's some type of qualified right to prison visitation. I've already seemed to have forgotten your answer to my question about eight years. Eight years would have been okay in this case? My argument would be yes, because there's no constitutional right. Absolutely, if there's no constitutional right. Fifteen years. That is correct. On these facts, we think that you took some contraband, we put you in the dry cell, we examined your feces, we didn't find anything, we put you in the special housing unit for two months or whatever it was, and now, in addition, we're going to deny you all visitation, not visitation from Ms. Massey, but you will spend the rest of your term in here, if it's life, for 20 years or 30 years. Fifteen years, no visitation. No constitutional implication to such a decision by a warden. Under existing precedent, I believe my answer is correct. Now, I can understand why. And you're relying on White, even though you can't find in White any discussion of a due process interest that inmates have to be free of arbitrary deprivation of visitation. Not some freestanding constitutional right to visitation, but the arbitrary deprivation of the enjoyment of visitation. Because you say there's no liberty interest in visitation under any circumstance. There's no liberty interest in visitation. So you think you'd read the Fourth Circuit law to say that, I think you do, to say the state could just limit visitation without suspecting anybody of anything. They could just have a blanket policy that once you come into our prison, you don't get to visit, period. Well, you know, looking at it at that extreme, yes, I believe that that under the United States That's the basis of your argument is that since the law doesn't grant, there's no constitutional right to visitation, as you read current Fourth Circuit law, that it doesn't even require them to suspect that somebody, as far as constitutional law, it doesn't even require that the state suspects somebody's done anything wrong. If they could just have a blanket policy of no visitation, you don't think that would run afoul of the Constitution. I do not believe it does. But of course, that's way beyond the issue in this court. And quite frankly, that's a difference between, would that be good public policy? Would that be good prison policy? Of course not. But, you know, what we're looking at is what does the United States Constitution absolutely require? Right. But that's why we push it to the extreme. And that is the basis. By the way, I think, didn't you come out of the box and say there's no constitutional right? You said that, didn't you? Well, I did, because that's the status of the law. And quite frankly, that's By the way, just let me paint my point. When I ask you about, you're the one that said it first, not me. And then you talk about me taking it to the extreme. Well, I borrowed it from you, quite frankly. I recognize that, and of course But now, but wait, but wait. So the next question becomes then, you say you don't think there's a violation under step one of looking at a constitutional violation of qualified immunity. Because you just take the position based on current law in the Fourth Circuit, there is no constitutional right. At least there. Correct? But then you say beyond that, step two, you clearly win. You think the law is clearly established to the contrary as he asserts it. That's correct. And even though there may be some question about it that we kind of work on and work through, and maybe some subsequent Supreme Court law or something, it may, in fact, give some pause to whether or not that Fourth Circuit law still might be good law. It certainly, while it may question how clearly the contrary is established, it clearly doesn't establish the right of constitutional visitation. Is that right? That's correct. Yeah, that's how your case is set up. And I think, quite frankly, I can take it a step further because in this particular case, Judge G. Ross Anderson, Jr., he decided this case based on White v. Keller, didn't go into this whole analysis, which is common in prison visitation cases, because White v. Keller holds for the proposition that there is no constitutional right. And so you don't need to do a detailed analysis. You don't even have to look into the factual background because we have that principle of law within this circuit, and if there's no federal law, I would submit neither Overton nor certainly not the Kentucky v. Thompson case. None of those cases override that. Now, of course, part of this analysis, and I know part of the exercise we're in here today, is asking me questions towards extremes. I do want to make the valid point in response to Judge Davis that in Overton, the United States Supreme Court did look at it from an Eighth Amendment perspective and found that a two-year suspension, which is exactly what we have here, a two-year suspension does not implicate the cruel and unusual punishment clause. But they did leave open for future consideration whether or not a de facto ban or a permanent ban would implicate cruel and unusual punishment clause. Now, importantly, they didn't give a hint one way or the other as to what they would do in that situation. They simply are saying that involves other consideration. You want to bet what they would do if there was a complete ban for the rest of their life? That would be cruel and unusual punishment. Gosh, it's hard to fathom they wouldn't find a problem with that, isn't it? They say that a person who does something that is suspected of doing something and maybe even shown to contraband one time to have a ban for the rest of his or her life, that would not be cruel and unusual. Doesn't that seem to skate over into cruel and unusual? You know, a facial policy of that, it's very difficult for me to even go to that extreme because obviously I don't believe there's a constitutional right. Of course, there doesn't have to be a constitutional right in order for some type of condition to ultimately be cruel and unusual, and certainly that could come into play. But I think a facial policy on that, certainly that raises a very, very difficult question. Do any of South Carolina's, I assume you represent the Department of Corrections on a fairly regular basis. I'm a private attorney, but I've been doing SEDC work for almost 20 years. The answer is yes, he does. Okay, good. So my question is, is there any policy of the South Carolina Department of Corrections that in your opinion gives rise to a constitutionally protected liberty or property interest? Any policy? Certainly. The disciplinary policy does. The disciplinary policy. Yeah, obviously. Explain that to us. What part of the disciplinary policy creates a liberty interest on the part of an inmate? Well, obviously based on Supreme Court case law and the case authority of this court, if there's a disciplinary sanction that can impact the liberty, granted good time credits being taken, things of that nature, obviously that— No, I mean internal prison policy, not when you get out. But in other words— Rights and privileges. Yeah, rights and privileges within the prison. Like going to solitary confinement or a special housing unit, whatever they call it. Going to the hole, as they used to say. Well, I mean we got a— Is there a liberty interest in not going to the hole? You got a maximum security unit, and certainly there's an argument that there's a liberty interest as to whether or not you're put there and you're entitled to a hearing. And you can also, in South Carolina we have a system that was created by our South Carolina Supreme Court which creates an appeals process of grievances beyond just the internal grievance. So there are things that the Corrections Department do, the South Carolina Corrections Department in particular, has done that creates a liberty interest. And your argument here is that the creation of a right to visitation, the creation under state law of the right to visitation does not create a liberty interest. Well, first of all, I disagree with your characterization. There is not a creation by state law of a right to visitation. Or state policy. In fact, the state policy very clearly states— State policy, okay. So state policy or the warden's policy, somebody's policy creates a right to visitation. Does not create a right, it creates a privilege. Okay, if you want to play the linguist game, that's fine. All right? That's what it says. So it's a privilege. So I guess that's your argument, that it's the old privilege versus right. And you don't think calling something a privilege categorically removes it from a liberty interest. Is that it? Well, again, what I'm relying on, Judge Davis, is I'm relying on Sand and V Connor. And that determines whether or not there's a liberty interest at play. And what my argument would be, a denial of visitation, certainly for two years, and that's what I'm dealing with in this particular case, is not an atypical and significant hardship in comparison. Would three years be—would it be three years? Well, again, no, I personally don't believe that. I'm trying to figure out what your limiting principle is. I understand you say six days denial of visitation or six weeks or six months. I'm just trying to find what the boundary is here. Because I'm assuming there must be some boundary. But maybe your position is there is no boundary, that calling it a privilege takes care of the whole thing. Well, the first argument I would have, based on White v. Keller, which I think is correctly decided— You keep bringing up White, and I thought we'd already agreed that White doesn't deal with this. I know you wanted to, but White doesn't resolve this case. The point is, is there's no constitutional right under the First Amendment, first of all. So then, okay, you want to focus on whether or not there's a liberty interest. You've got Kentucky v. Thompson that point-blank, the United States Supreme Court says, the due process clause does not create a liberty interest. No, I'm not talking about the due process clause creating a liberty interest. Of course it doesn't. Right. State law creates a liberty interest. Am I really being that unclear? No, but in this particular case, we don't have any state statute that allows for visitation. But a state policy can create a liberty interest. A policy can, but that's all pre-Sandon. The Hewitt v. Helms analysis looks at whether or not there's mandatory language in the policy. And the United States Supreme Court got away from that analysis and changed it completely in Sandon v. Conner. So I would submit to the court that none of that is the relevant standard for evaluating whether or not there's a liberty interest post-Sandon. What the court has to look at— What is the standard? Whether or not there's an atypical and significant hardship in comparison to ordinary prison life. Okay. And, of course, that's a judicial standard. And doesn't the policy create—does not a policy on visitation create not just an expectation, but the reality that inmates are entitled to one visit a month or one visit every two—whatever it is. You're saying categorically such a policy can never create, because it's a privilege, can never create a constitutionally protected liberty interest. Well, I know the policy's not in this record because it didn't need to be to evaluate the case based on White v. Keller. But certainly that's the way the district court looked at it. But I can represent to this court that the policy specifically says there is no right to visitation, that it is a privilege, and it can be withdrawn. Now, typically it's done because there's some sort of infraction. I don't think you wanted to use the word typically, right? Well— Because that's part of your test. No. If something's atypical, then—anyway. Well— I appreciate your dialogue. Can I finish that point? It's okay with Judge Hitt. I certainly didn't mean to suggest there's a sanding issue by using the word typically. What I was trying to draw the distinction of is the plaintiff in this particular case suggests that it has to be a disciplinary infraction in order to be able to withdraw or suspend visitation. In this particular case, there was none. But there was evidence based on what was seen by that correctional officer, what was videoed by that correctional officer, and what he has sworn to and put in his incident reports. There was a factual basis for the warden's action. He didn't just grab the guy and say, you're not having a visitation. I'm sorry. If it is true that your position is that there is no constitutional right based on our law, and it may hinge as what his rights or liberal interests may be may be created by way of a policy, what do we do and how do we deal with the fact that the policy is not in the record? What do we do? Remand it to get that information? What do we do? I don't think it was necessary for the policy to be because, number one, he didn't argue that there was any type of facial challenge to the policy. Obviously, the plaintiff had the burden of supporting his own case. So you think it's somewhat a burden of proof issue. You make your claim. He gets the information out. That's correct. If you don't, you don't meet your burden. That's correct. And, again, based on the precedent within the circuit, based on the Supreme Court precedent we're relying on, I mean, remember, Overton also did analyze it from a due process perspective and found that a two-year suspension under those circumstances didn't violate, didn't give rise to any type of liberty interest, didn't violate the 14th Amendment. Mr. Lindeman. Based on the facts we have in this case. Mr. Lindeman, I think you've been paroled. Thank you very much. Ms. Small. Does that mean I've been revoked, Your Honor? To start where you left off, Your Honor, we can't know what is atypical understanding unless we first know what is typical. And we don't know that because we don't have the visitation policy in the record. We don't know, for example, whether a two-year denial of visitation for any reason is typical. But whose fault is that? Well, Your Honor, Mr. Williams asked for production of that document. He asked for production of other policies. The state said they're in the library, you don't need them. And then it said White v. Keller controls this, and summary judgment for the state. That's essentially what happened. So I recognize that Mr. Williams has the burden of proof, but as a pro se plaintiff, he raised the claim, he asked for the discovery, he didn't get it, and the court decided it's a matter of law. What would you have us do with the White case? What would you say we do with that White case? I would say the White case is not binding on you, Your Honor. It's an unpublished procurement opinion. You're not bound by unpublished decisions. It was decided in 1977 before a great deal of development of the law, before Turner, before certainly Overton, before a number of cases where the court recognized the possibility of a right to association and applied an analysis looking at policies that abridged that right. Well, did it even deal with due process? I don't think it did, Your Honor. It dealt with First Amendment associational rights, and to that extent, I don't think it's binding there either because of the subsequent development of the law and because the Fourth Circuit's decision is not published. Isn't it published? I thought it was a published procurement. Am I incorrect in my thinking it was? Okay, I apologize. I can't find it right now, but I think it's published. I think it's published. It's published where we do one of those procurement and pick up and drop. Back in the day, we used to do that kind of thing. All right, that's my area, then I regret that. I would think about doing it more. One way or the other. My argument still would be that it's been substantially undermined by subsequent developments in the law, but if we focus on the due process. Well, but you don't suggest that this panel can, based on developments in the law, generally can deviate from a prior panel. No, I don't, Your Honor. I don't think the developments are that clear that you could do that in this case. So what would we do then? It would be qualified immunity then at the very minimum, the second stage of qualified immunity because the law is not clearly established, so you would lose on that? As to a damages claim, yes, which is why we're really talking about declaratory relief and not damages relief. I don't think that's going to be, quite frankly, available to Mr. Williams because I don't think it's clearly established, even if there was a constitutional violation at that time. Okay. Anything else? Anything else for me? Any questions? Ms. Small, we note that you're court-appointed. We thank you very much for taking that assignment. You know you've probably heard this speech before. We appreciate the job that you do, and the court feels like we have to have people willing to take those assignments to present the case, and we thank you for what you've done here. Nice to see you back at the court as well. You too, Mr. Lindeman. Thank you. If there's nothing further then, we will adjourn the court and step down to the Greek Council. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Dennis W. Shedd, Andre M. Davis, Barbara Milano Keenan